The **EXCHANGE AND SAVINGS BANK OF BERLIN**, Appellee,

v.

**UNITED STATES** of America, Appellant.

No. 10398.

United States Court of Appeals Fourth Circuit.

Argued June 1, 1966.

Decided Sept. 6, 1966.

---

Jonathan S. Cohen, Atty., Dept. of Justice (C. Moxley Featherston, Acting Asst. Atty. Gen., and Lee A. Jackson, Atty., Dept. of Justice, and Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, Asst. U. S. Atty., on brief), for appellant.

Lawrence A. Kaufman (John W. Cable, III, and John S. McDaniel, Jr., Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, J. SPENCER BELL, Circuit Judge, and HEMPHILL, District Judge.

J. SPENCER BELL, Circuit Judge:

The United States appeals from a summary judgment for the plaintiff, The Exchange and Savings Bank of Berlin, Maryland, in an action brought by the bank to recover income taxes and interest for the years 1957, 1958 and 1959. The district court held that the bank qualified for exemption from taxation during the years in question under the provisions of section 7507(b) of the Internal Revenue Code of 1964.[1] We cannot agree.

On February 11, 1932, the bank's directors placed it in the hands of a receiver. On March 19, 1932, an agreement was entered into between the bank and its depositors under which the depositors assigned to the bank fifty per cent of their deposits[2] and received in return a lien on the bank's future earnings. By 1957 the balance due to the depositors under this agreement had been reduced to $91,878.59. The bank's statement as of the close of business on December 31, 1957, showed a special reserve account of $79,038.88 which had been set aside to meet its obligations to the depositors. During that year the bank's net earnings were $25,284.83 ($17,636.72 after taxes). Thus, the amount of the bank's earnings in the special fund, plus its current earnings after taxes, exceeded the amount which it needed to pay off the depositors' claims in full by $4,797.01. In addition to this sum, the bank statement carried a surplus of $65,000.00, of which all but approximately $13,000.00 was conceded to have been derived from earnings subsequent to 1932. It was also stipulated that the bank's statements represented a true and correct statement of the bank's financial condition. The situation in 1958 and 1959 continued to improve to the extent that the special fund itself, without more, was adequate to pay off the depositors in full. Indeed, the ex-

---

1. "26 U.S.C. § 7507 (1964) : Exemption of insolvent banks from tax.

"(b) Segregated assets; earnings.— Whenever any bank or trust company, a substantial portion of the business of which consists of receiving deposits and making loans and discounts, has been released or discharged from its liability to its depositors for any part of their claims against it, and such depositors have accepted, in lieu thereof, a lien upon subsequent earnings of such bank or trust company, or claims against assets segregated by such bank or trust company or against assets transferred from it to an individual or corporate trustee or agent, no tax shall be assessed or collected, or paid into the Treasury of the United States, on account of such bank or trust company, such individual or corporate trustee or such agent, which shall diminish the assets thereof which are available for the payment of such depositor claims and which are necessary for the full payment thereof. The term 'agent', as used in this subsection, shall be deemed to include a corporation acting as liquidating agent."

2. The item amounted to $258,736.03.

cess of surplus[3] over the amount needed to satisfy the old depositors plus income taxes was $95,818.97 for 1958 and $112,818.45 for 1959.

In 1957, the State Banking Commissioner, after consulting with the officials of the Federal Deposit Insurance Corporation, of which the bank is a member, declined the bank's request to permit it to make a payment of 5% of the unpaid balance to its old depositors on the ground that such a payment would have jeopardized the safety of the bank's current depositors as well as the eventual payment in full of the old depositors under the 1932 agreement. In 1958, the bank was permitted to make a payment of 10% or $25,491.75 upon condition that the bank improve the condition of its loan portfolio. The condition was met and the payment made. In 1959 and 1960 the bank was allowed to pay 10% each year. In 1961 the remaining balance was paid.

In essence, the statute in question provides that whenever a bank has entered into such an agreement as here existed, no tax shall be collected "which shall diminish the assets [of the bank] which are available for the payment of such depositor claims and which are necessary for the full payment thereof." The district court interpreted the words "available for payment" to mean available for immediate distribution under the orders of any banking authorities recognized by the taxpayer bank as controlling its operations. We think the test of "availability" intended by Congress was whether the assets were on hand without regard to whether the relevant banking authorities were willing to allow such assets to be paid out at that time. In this case the taxpayer's books furnished the best test of whether those assets were available since all parties are agreed that the statement did not understate the market value of the bank's assets and that at least by 1957 there were available sufficient funds to pay off the old depositors in full.

The district court judgment was based upon the per curiam opinion of the Sixth Circuit in United States v. Bank of Leipsic Co., 272 F.2d 341 (6 Cir. 1959), but we must respectfully disagree with the rationale of that opinion. We begin with the premise that section 7507(b), being an exemption provision, should be construed strictly against the taxpayer. Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940). We think it also apparent that the purpose of the statute was to benefit the old depositors as an inducement to them to refrain from demanding immediate liquidation of a bank which was in trouble and not to benefit the stockholders as such. In Clinton Trust Co. v. United States, 52 F.Supp. 671, 679–680, 100 Ct.Cl. 348 (1943), the Court of Claims summarized its purpose as follows:

"The statute does not permanently forswear the collection of taxes for the benefit of depositors of an insolvent bank. It defers their collection to the extent to which the tax money goes to pay the depositors. The bank and its owners are not intended to gain or the Government to lose taxes as a result of the application of the statute. * * * The taxes are therefore collectible, and collectible immediately, out of any part of the earnings of the bank which, if not paid out for taxes, would still not be paid to the depositors."

Legislative history does not support the conclusion that the word "available" as used in the statute was meant to be construed as currently available for distribution instead of meaning simply on hand. Indeed the "available" phraseology was not contained in the original version of section 818(b) of the 1938 Act as drafted by the Senate Finance Com-

---

3. In 1958, this included the current earnings after taxes, the surplus of $70,000.00 and the special reserve of $76,459.77.

In 1959, the surplus was $75,000.00 and the special reserve $61,830.30.

mittee and passed by the Senate. That version simply required that

> " * * * no tax shall be assessed or collected * * * which shall diminish the assets * * * necessary for the full payment of such depositor or other creditor claims."

When it was decided by the Congress to eliminate the provisions above relating to "other creditor claims" than those of depositors, the language of the bill was amended in conference to read as it does today. It was this committee which used the word "available," but it is apparent from the report that it was not dealing with the distinction between "on hand" and immediately available for payment to depositors under local administrative decision. The report[4] provides as follows:

> "(1) The provisions which prohibit assessment and collection of tax where the effect would be to diminish the assets available for the payment of creditors other than depositors have been eliminated. The result of this change is that in cases where the claims of creditors are junior to the claims of depositors, if depositors' claims would not be diminished by the payment of taxes, then the abatement of tax does not apply. If, however, creditors' and depositors' claims rank equally, taxes which would diminish the assets available for either would diminish the assets available for both, and in such cases taxes would be abated."

 We think it clear from the above report that the word "available" was used in the statute to reach those cases where other creditors shared on equal rank with the depositors. Such is not the case here, where it is conceded that the old depositors hold claims superior to existing creditors of the bank. We think this history refutes the plaintiff's contention that the Congress's intention was to permit the statutory exemption to continue until the bank not only had on hand accumulated assets sufficient to pay off its old depositors but also had built up a cushion of tax-free working surplus which would satisfy the various standards of local administrative authorities. When the funds are safely on hand the congressional objective has been accomplished and the bank should again operate on an equal basis with its competitors.

Reversed.

---

4. H. Conference Rep. No. 2330, 75 Cong., 3d Sess., pp. 55–56 (1939–1 Cum.Bull. (Part 2) 817, 835).